**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 13-cv-2514-WJM-KMT

LEATHEM STEARN,
UTE MESA LOT 1, LLC, a Colorado limited liability company, and
UTE MESA LOT 2, LLC, a Colorado limited liability company,

      Plaintiffs,

v.

CATALUS CAPITAL, LLC, a Connecticut limited liability company,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

      Plaintiffs Leathem Stearn ("Stearn"), Ute Mesa Lot 1, LLC, and Ute Mesa Lot 2,

LLC (collectively, "Stearn") bring this lawsuit against Catalus Capital, LLC ("Catalus") for

alleged breach of contract and conversion.  (ECF No. 1.)  Before the Court is Stearn's

Motion for Partial Summary Judgment ("Motion").  (ECF No. 48.)  For the reasons stated

below, the Court holds that Stearn is entitled to judgment as a matter of law on a subset

of his breach-of-contract claim (*i.e.*, a claim for a particular $9,274.66 that Catalus has

refused to refund).  The Court further holds that Catalus's counterclaims for fraud and

negligent misrepresentation fail as a matter of law.  The Motion is otherwise denied.

## I.  LEGAL STANDARD

      Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTS

The following facts are undisputed unless otherwise noted.

### A.   General Background

Stearn alleges that Ute Mesa Lot 1 and Ute Mesa Lot 2, both limited liability companies, developed two separate parcels of real property in Aspen, Colorado, known as Lot 1 and Lot 2. (ECF No. 1 ¶ 9.) Stearn further claims that Ute Mesa Lot 1 and Ute Mesa Lot 2 procured separate construction loans from different lenders to build single high-end residential properties on each of the parcels of property. (*Id.* ¶ 11.) While the house on Lot 2 was constructed, Stearn says, the house on Lot 1 was not constructed

2

because Ute Mesa Lot 1 filed Chapter 11 Bankruptcy in 2010.  (*Id.* ¶¶ 12–13.)   Stearn

alleges that he then sought financing that would permit him to complete construction on

Lot 1 and pay off the loan on Lot 2.  (*Id.* ¶ 16.)

**B.     The Term Sheet**

Stearn's need for a new lender eventually led him to Catalus.  On February 27,

2013, Stearn and Catalus executed a document titled "Aspen—Indicative Summary of

Terms $29 million Debt Facility" (the "Term Sheet").  (ECF No. 48 at 5, ¶ 2; *see also*

ECF No. 48-1.)  As its formal name suggests, the Term Sheet contemplates a

$29 million loan, but it also states explicitly that it is non-binding except with respect to

four specific provisions:

> The Borrower, on behalf of itself and its Subsidiaries,
> acknowledges that the provisions described above (other
> than those under the Indemnification, Governing Law,
> Diligence Expenses, and Exclusivity headings) are
> non-binding and do not purport to summarize all of the
> conditions, covenants, representations, warranties and other
> provisions that would be contained in definitive
> documentation for the Loan. *This Term Sheet is not an*
> *agreement to extend credit*.  Any agreement of the Lender to
> extend credit to the Borrower is subject to due diligence as
> well as the negotiation and execution of definitive
> documentation required by the Lender.  Notwithstanding the
> foregoing, Borrower acknowledges the binding nature of,
> and agrees to comply with, the provisions under the
> Indemnification, Governing Law, Diligence Expenses, and
> Exclusivity headings.

(ECF No. 48 at 5, ¶ 3 (emphasis added).)

The referenced Indemnification section requires Stearn to indemnify Catalus for

liabilities "arising out of or relating to the Loan, the transactions contemplated by the

Loan Documents, [or] the Borrower's use of loan proceeds or the commitments."  (ECF

No. 48-1 at 5.)

The Governing Law section specifies Connecticut law.  (*Id.*)

The Diligence Expenses section states that "the loan shall be without cost to Catalus," and therefore requires Stearn to deposit money with Catalus "to defray travel, legal and due diligence expenses and other costs and expenses in connection with this transaction."  (*Id.* at 4.)  The Term Sheet requires an initial deposit of $15,000 and allows Catalus to request more as additional expenses are incurred.  (*Id.*)  But, "[i]n the event this Loan is not consummated, the unused portion of the Expense Deposit shall be refunded to Borrower."  (*Id.*)

The Exclusivity section requires Stearn, with certain exceptions not relevant here, to refuse to work with any other potential lender during the due diligence anticipated by the Term Sheet.  (*Id.*)  It also requires Stearn to pay a "break-up fee of 2% of the Loan amount" if he is "unwilling or unable to close for any reason" "within 60 days of the execution of this agreement."  (*Id.*)

The parties agree that the Term Sheet's basic purpose was to establish "indicative" terms of a possible loan and then to facilitate due diligence of that loan. (ECF No. 48 at 5–6, ¶¶ 5–7.)

## C.  Deposit Payments

On February 28, 2013, Stearn (or at least one of the Plaintiffs) deposited $15,000 with Catalus as required by the Term Sheet.  (*Id.* at 6, ¶¶ 11–12.)  Catalus then began its due diligence.  (*Id.* at 7, ¶ 15.)  In early April 2013, Catalus requested and Stearn remitted an additional $15,000.  (*Id.* ¶¶ 16–17.)  In late April, Catalus requested

and Stearn remitted another $35,000.  (*Id.* ¶¶ 18–19.)  In total, then, Stearn fronted

$65,000 for Catalus's due diligence expenses.

**D.    The Unraveling**

On May 13, 2013, Catalus presented Stearn with a new term sheet, proposing

what Stearn claims to be a very different loan from that contemplated in the original

Term Sheet.  (*Id.* ¶¶ 21–23.)  The parties' relationship fell apart from here.

In June 2013, Catalus calculated that it had not spent $9,274.66 of the $65,000

advanced by Stearn.  (ECF No. 51-3 at 3.)  Catalus therefore sent a "General Release

and Deposit Return" form to Stearn, requesting that he sign it (and thereby release any

liability claims) to receive a refund of the $9,274.66.  (*Id.* at 4.)  As this lawsuit

demonstrates, Stearn did not sign that form.

In July 2013, Stearn's lawyer sent a demand letter to Catalus, asserting various

damages allegedly suffered due to Catalus's failure to produce a loan offer according

the Terms Sheet's expectations, and requesting $150,000 to settle the dispute.  (ECF

No. 48-9 at 2–3.)  Catalus's attorney responded by stating, "[I]t is our position that

Catalus Capital does not owe your client anything beyond a return of the remainder of

the initial $65,000.00 investment.  This amount is $9,274.66."  (ECF No. 48-10 at 2.)

Surprisingly, however, Catalus's attorney did not enclose a check or state that one

would be on the way.  Rather, he characterized the return of the $9,274.66 as a

"counteroffer" to Stearn's $150,000 demand, "less the legal expenses Catalus Capital

has incurred thus far in defending this claim."  (*Id.*)  Stearn did not accept this offer, and

Catalus continues to possess the $9,274.66.  (ECF No. 48 at 8–9, ¶ 37.)

5

Stearn then brought this lawsuit, suing Catalus for breach of contract and conversion.  (ECF No. 1.)  As damages, Stearn requests the entire $65,000 advanced to Catalus (including the unspent $9,274.66) as well as consequential damages incurred due to Catalus's allegedly bad faith conduct.  (*Id.* ¶¶ 53–58.)  Catalus has counterclaimed for breach of contract (alleging that Stearn now owes the 2% break-up fee, *i.e.*, $580,000), breach of the covenant of good faith and fair dealing, negligent misrepresentation, and fraud.  (ECF No. 33 at 7–13.)

### III.  ANALYSIS

**A.      Contract Claims**

   1.      <u>"Judicial Admission" of Material Terms</u>

The Term Sheet states that it "is not an agreement to extend credit" and is "non-binding" save for its "Indemnification, Governing Law, Diligence Expenses, and Exclusivity" sections.  (ECF No. 48 at 5, ¶ 3.)  Stearn argues, however, that Catalus has judicially admitted that the Term Sheet was a binding agreement on all material terms of the loan and Catalus therefore breached the Term Sheet by refusing to fund the loan.  (*Id*. at 10–14.)  Stearn reaches this conclusion by connecting the following items of evidence:

First, Stearn points to the Term Sheet's Exclusivity clause, which states that Stearn owes Catalus "a break-up fee of 2% of the Loan amount" if he is unwilling or unable to close within sixty days of the Term Sheet's execution.  (ECF No. 48-1 at 4.)

Second, Stearn highlights negotiations between himself and Catalus principal Marek Olszewski in May 2013 about extending the Exclusivity provision.  (*See* ECF No.

6

51-2 at 25; ECF No. 57-1 at 2.)  Apparently Olszewski proposed, via e-mail, to change

the break-up fee deadline to twenty-one days from the execution of an amended term

sheet.  (ECF No. 51-2 at 25.)  Stearn responded, "Agreed that [if] I refuse to fund [due

diligence] expenses, then the break-up fee would be due.  However, if I cannot fund

then the date should extend until I do fund.  Add that language along with a three week

extension for original deal."  (*Id.*)[1]  Olszewski replied that "the current language [of the

Term Sheet's break-up provision] addresses a situation where Catalus would [b]e ready

to close and you would not."  (ECF No. 57-1 at 2.)  In other words, Olszewski

interpreted the break-up provision coming into play only when the deal was all but done.

Thus, Olszewski went on, "Since our ability to be in the position to close is based on

you continuing to fund diligence expenses, this clause is essentially meaningless.  You

can stop funding diligence and we won't ever get to a position where we're ready to

close."  (*Id.*)  Olszewski hoped that an amended term sheet would "address that issue."

(*Id.*)

Third, Stearn notes that on July 10, 2014, Catalus filed its answer and

counterclaims in this action, and in particular, counterclaimed for the break-up fee.

(ECF No. 33 at 10–11.)

Fourth, Stearn emphasizes language from Olszewski's December 2, 2014

deposition, where he represented Catalus as its Rule 30(b)(6) designee.  During that

deposition, Stearn's counsel asked a series of questions about Catalus's general

procedures for preparing to close a loan.  For example:

---

[1] The language of Stearn's e-mail comes from a portion of a deposition where it is quoted.  The Court cannot locate the e-mail itself in the record.

> Q.  Okay.  You would agree with me that Catalus would not be ready to close on a transaction until the material terms of the deal were agreed upon and funding for the transaction had been secured; is that right?
>
> A.  Yes.
>
> Q.  Okay.  And if the deal progressed to the point where the material terms were agreed upon and Catalus had its funding lined up, only then would Catalus be ready to close; is that correct?
>
> A.  As long as everything else is satisfactory to us, then yes.

(ECF No. 51-2 at 25.)

Taking these four data points together, Stearn reasons essentially as follows: Given that (a) Catalus, in the abstract, would not be ready to close without agreement on all material terms, (b) Catalus (or at least Olszewski) believed that the break-up fee would not apply unless Catalus was ready to close, and (c) Catalus counterclaimed for the break-up fee, Catalus has judicially admitted that all material terms for the loan to Stearn had been agreed upon.  (ECF No. 48 at 12–14.)  "That," says Stearn, "is the only way [Catalus] could allege its Counterclaim for a break-up fee, in good faith, under Fed. R. Civ. P. 11."  (ECF No. 57 at 11.)  So, the argument continues, the Term Sheet was in fact binding in all respects and Catalus breached it as a matter of law by failing to fund the loan.  (ECF No. 48 at 14.)

The Court disagrees.  An indispensable premise of Stearn's argument is Olszewski's May 2013 e-mail interpreting the break-up provision to apply only if Catalus is ready to close.  But that same e-mail exchange between Olszewski and Stearn is evidence that neither party was, at that time, ready to close.  Rather, they were negotiating an extension of the Term Sheet to continue due diligence.

The parties agree that Connecticut law governs the Term Sheet.  (ECF No. 48 at 9, ¶ 38.)  Like most jurisdictions, Connecticut requires a "meeting of the minds" before a contract can be said to exist.  *See, e.g.*, *Farrell v. Twenty-First Century Ins. Co.*, 21 A.3d 816, 823 (Conn. 2011); *SS-II, LLC v. Bridge St. Assocs.*, 977 A.2d 189, 197–98 (Conn. 2009).  If due diligence was continuing, then evidence exists to show that no meeting of the minds took place in May 2013, and especially not a meeting of the minds sufficient to override the Term Sheet's explicit "non-binding" language.

Moreover, when Stearn, through counsel, sent his July 2013 demand letter to Catalus (*see* Part II.D, *supra*), Stearn did not insist that the parties had come to a binding agreement on material terms or that Catalus had breached those terms by failing to fund the $29 million loan.  Rather, Stearn argued that Catalus had misused the $65,000 advanced for due diligence and had therefore breached the covenant of good faith and fair dealing.  (ECF No. 48-9 at 2.)  Stearn then asserted "return of the $65,000.00" as part of the damages he would claim in any lawsuit, but offered to settle for $150,000.  (*Id.* at 3.)  Thus, evidence exists to show that, as of July 2013, Stearn himself apparently did not believe that a meeting of the minds took place sufficient to make the Term Sheet binding for the full $29 million loan.

Indeed, the only event that supposedly converted the Term Sheet from non-binding to binding was Catalus's choice to file a counterclaim for the break-up fee—which, Stearn says, Catalus could not do consistent with Rule 11 absent a conclusion that the Term Sheet had become binding.  This still does not address Stearn's own state of mind at that time, or whether the filing of a counterclaim can effectively amend the Term Sheet, but in any event, Stearn is incorrect.  At the pleading

phase, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

Obviously this creates certain issues going forward, to the extent Catalus continues to pursue this counterclaim. Catalus presently asserts that the break-up fee applies regardless of whether Catalus was ready to close (ECF No. 51 at 15), but Olszewski certainly represented otherwise in his May 2013 e-mail to Stearn. Then, at his deposition, Olszewski testified that he may have "misread" or "misinterpreted" the break-up fee provision in that May 2013 e-mail. (ECF No. 51-2 at 27, 28.) So there may be a question for trial regarding what the parties actually intended when drafting the break-up fee provision.[2] But the existence of the counterclaim is not a judicial admission that the Term Sheet represents the binding, material terms of an agreement to lend money. *See, e.g.*, *Shell v. Am. Family Rights Ass'n*, 899 F. Supp. 2d 1035, 1047 (D. Colo. 2012) ("Generally, judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute."). Accordingly, the Court rejects Stearn's summary judgment argument in this regard.

### 2.   The Leftover $9,274.66

Next, Stearn seeks judgment as a matter of law for the $9,274.66 left over from the $65,000 advanced to Catalus for due diligence. (ECF No. 48 at 14–15.) Notably,

---

[2] This question is all the more interesting given that, in May 2013, it appears that both parties interpreted the break-up fee provision contrary to their respective best interests. But the effect of this nuance, if any, is not before the Court at this time. Also not before the Court is the extent to which contract interpretation questions can go to a jury under Connecticut law.

as described above, Catalus itself concluded that it "owe[s] [Stearn] . . . a return of the remainder of the initial $65,000.00 investment.  This amount is $9,274.66."  (ECF No. 48-10 at 2.)  Olszewski, testifying for Catalus, even stated at his December 2014 deposition that Catalus intended to return the money "soon."  (ECF No. 48 at 8, ¶ 31.) Catalus, however, has not since acted on that intention.  (*Id.*)  Thus, it would seem beyond dispute that Catalus breached the Term Sheet provision stating, "In the event this Loan is not consummated, the unused portion of the Expense Deposit shall be refunded to Borrower."  (ECF No. 48-1 at 4.)  Catalus nonetheless asserts a number of defenses.

First, Catalus argues that Stearn "refused to accept the return of the money." (ECF No. 51 at 20.)  The Court disagrees.  Catalus refers to the June 2013 e-mail from Olszewski to Stearn where Olszewski states, "I've attached a breakdown of the due diligence expenses incurred on the Ute Mesa loan and a separation form.  Please sign the attached agreement and provide us instructions for returning the balance of your deposit."  (ECF No. 51-3 at 2.)  The "separation form" is titled "General Release and Deposit Return" and states that all parties release each other from all potential claims. (*Id.* at 4.)  But the Term Sheet already unconditionally entitled Stearn to return of the money.  Thus, it should go without saying that refusing to sign a form that *conditions* the refund on a general release (or on anything else, for that matter) is not a refusal to accept the refund.[3]

---

[3] Catalus insists that the consideration for the release "was $10.00 and was separate and apart from the return of the $9,274.66."  (ECF No. 51 at 6, ¶ 29.)  But that $10 was, in fact, deducted from the amount to be returned to Stearn.  (*Compare* ECF No. 51-3 at 2 *with id.* at 3.) And in any event, the "General Release and Deposit Return" is a one-page, integrated

Second, Catalus asserts that "[n]o demand for the return of the $9,274.66 has been made by [Stearn]." (ECF No. 51 at 20.)  Catalus maintains, in particular, that Stearn's July 2013 letter demanding $150,000 does not count as a demand specifically for return of the $9,274.66. (*Id.* at 7, ¶ 34.).  But the Term Sheet does not require a demand, so this argument does not excuse liability.  At most, the presence of a demand may affect the date on which prejudgment interest, if any, begins to accrue. *See Ebonie S. v. Pueblo Sch. Dist. 60*, 2015 WL 1906086, at *1 (D. Colo. Apr. 23, 2015) ("a court awarding prejudgment interest must determine the date of accrual").  But whether to award prejudgment interest (and if so, the accrual date) is governed by standards the parties' briefs do not address, *see id.*, so the Court need not reach the accrual question at this time.

Finally, Catalus at times asserts that it has never received instructions from Stearn on how to remit the money. (*See, e.g.*, ECF No. 51 at 6, ¶ 29.)  Catalus also suggests confusion regarding which of the three Plaintiffs is actually owed the money. (*Id.* ¶ 28.)  To the extent this is meant as a serious defense, it fails.  Any reasonably experienced litigator should know that, at least from the beginning of the lawsuit, Catalus could tender the disputed amount to Stearn's counsel for deposit into counsel's trust account, at which point it would be Stearn's counsel's duty to determine the plaintiff to which the money should be remitted.  Under the circumstances, then, it is no defense to plead ignorance of the repayment details.

---

document with a single signature block.  No reasonable person could interpret it as containing two independent agreements, one for the release of claims and another for the return of the $9,274.66.

The Court therefore finds that Catalus breached its obligation under the Term Sheet to return the leftover portion of the due diligence deposit, and Stearn is consequently entitled to judgment as a matter of law for $9,274.66.  This finding, however, does not constitute a "judgment" under Rules 54 or 58.  At this time, the Court only holds that Stearn's entitlement to $9,274.66 is established as a matter of law and therefore no longer an issue for trial.

**B.      Conversion**

Stearn also requests judgment as a matter of law that Catalus converted the $9,274.66.  (ECF No. 48 at 15–16.)  Given the Court's holding that Catalus owes this amount as a matter of contract, the Court need not reach the conversion question.

**C.      Fraud & Negligent Misrepresentation Counterclaims**

Finally, Stearn seeks summary judgment on Catalus's counterclaims for fraud and negligent misrepresentation.  (*Id.* at 17–19.)  Catalus's theory seems to be that it was negligently or intentionally misled by Stearn as to his financial status, ability meet the projected terms of the loan, etc., and thereby tortiously induced to sign the Term Sheet.  (*See* ECF No. 33 at 7–10, 11–13; ECF No. 51 at 24.)

Stearn attacks these counterclaims on several fronts, but the Court finds that it need only address one of them.  Specifically, Stearn argues that Catalus has not proved and cannot prove damages, because Stearn paid all of Catalus's due diligence expenses.  (ECF No. 48 at 19.)  *See also Coppola Const. Co. v. Hoffman Enterprises Ltd. P'ship*, 71 A.3d 480, 487 (Conn. 2013) (damages are an element of negligent misreprestation); *Duplissie v. Devino*, 902 A.2d 30, 38 (Conn. App. Ct. 2006) (damages

13

are an element of fraud).

Catalus's only response is that it "invested large amounts of time and human capital and the effort.  Further, Catalus suffered lost time, loss of opportunity, and lost profits."  (ECF No. 51 at 24.)  Assuming without deciding that these items could be compensable damages under the circumstances, they would require factual support, of which Catalus has offered none.  The sentences just quoted are bare assertions, not supported by any citation of any kind, much less a citation to factual material in the record.

In the face of a summary judgment argument that Catalus has suffered no damages, Catalus cannot simply assert the contrary and thereby preserve the issue for trial.  *See* Fed. R. Civ. P. 56(c)(1)(A).  The Court accordingly grants summary judgment in Stearn's favor on Catalus's fraud and negligent misrepresentation counterclaims.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Stearn's Motion for Partial Summary Judgment (ECF No. 48) is GRANTED IN PART and DENIED IN PART.  The Court holds as a matter of law that Stearn is entitled to at least $9,274.66 in breach-of-contract damages, and that Catalus's third and fourth counterclaims (negligent misrepresentation and fraud) fail for lack of damages evidence.  Stearn's Motion is otherwise denied; and

2.    This matter REMAINS SET for a four-day jury trial beginning on February 16, 2016, with a Final Trial Preparation Conference at 2:00 p.m. on January 29, 2016, in Courtroom A801.

Dated this 23rd day of July, 2015.

BY THE COURT:

_____
William J. Martinez
United States District Judge